

Honorable Bruce A. Markell
United States Bankruptcy Judge

**Entered on Docket
June 20, 2013**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: ) | BK-S-10-14813-BAM |
| ) | Chapter 7 |
| JODY MARIE CUOMO, ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |
| GREGORY KELLY, ) | BK-S-12-1124-BAM |
| ) | Adversary Proceeding |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Date:       April 2, 2013 |
| JODY MARIE CUOMO, ) | Time:       3:00 p.m. |
| ) | Courtroom:  3 |
| Defendant. ) | |
| ) | |
| _____ ) | |

**OPINION SANCTIONING ATTORNEY ANTHONY J. DELUCA FOR FAILING**

**TO SCHEDULE A KNOWN DEBT AND GRANTING HIS MOTION TO**

**WITHDRAW AS COUNSEL FOR JODY MARIE CUOMO**

I.      INTRODUCTION ................................................. 3

II.     FACTS ........................................................ 3
        A.      Cuomo's Prior Bankruptcy Filings ..................... 3
        B.      The Instant Bankruptcy Case .......................... 4
        C.      The Adversary Proceeding ............................. 6
        D.      The Order to Show Cause .............................. 6
        E.      The Motion to Withdraw ............................... 7

III.    THE PARTIES AND THEIR POSITIONS .............. 8
        A.      DeLuca's Arguments ................................... 8
                1.      Sanctions .................................... 8
                2.      Motion to Withdraw .......................... 11
        B.      Cuomo's Contentions ................................. 11
        C.      Factual Findings .................................... 11

IV.     LEGAL ANALYSIS .......................................... 13
        A.      Sanctions ........................................... 13
                1.      "Specifically Targeting" DeLuca and His Firm ..... 13
                2.      Interplay Between State and Federal Law ...... 14
                3.      Nev. Rule of Prof'l Conduct 1.1 — Duty of Competence ........... 14
                        a.      Legal Standard ...................... 14
                        b.      Application ......................... 16
                4.      Nev. Rule of Prof'l Conduct 1.2 — Scope of Services ............. 21
                        a.      Legal Standard ...................... 21
                        b.      Application ......................... 21
                5.      Nev. Rule of Prof'l Conduct 1.5 / Rule 2016 — DeLuca's Fees ...... 22
                6.      Section 707(b)(4)(C) ........................ 22
                        a.      Legal Standard ...................... 22
                        b.      Application ......................... 23
                7.      The Sanctions Imposed ....................... 25
                        a.      The Purpose of Sanctions ............ 25
                        b.      The Range of Sanctions .............. 25
                        c.      The *ABA Standards* ................. 27
                                (1)     The Duties Violated ......... 27
                                (2)     DeLuca's Mental State ....... 29
                                (3)     Seriousness of the Injury ... 30
                                (4)     Aggravating or Mitigating Factors .......... 31
                        d.      Fee Disgorgement .................... 32
        B.      Motion to Withdraw .................................. 33
                1.      Legal Standard .............................. 33
                2.      Application ................................. 35

V.      CONCLUSION ............................................... 36

# I.    INTRODUCTION

This memorandum addresses the question of whether a consumer bankruptcy attorney must review a client's prior bankruptcy petitions to determine whether the information in those petitions is consistent with the information in the client's current credit reports and the information presently provided by the client.  With some limitations, the answer is yes.

# II.    FACTS

### A.    Cuomo's Prior Bankruptcy Filings

This bankruptcy case is Cuomo's third since 2009.  In April 2009, she filed a Chapter 7 petition (the "First Petition").  (Case No. 09-16409-bam, Dkt. No. 1.)  Her attorney was William J. Crock ("Crock") of the Nevada Law Group.  In the First Petition, Cuomo certified that she had timely obtained the required credit counseling but did not file the related credit counseling certificate.  (*Id.* at 4.)  In June 2009, the case was dismissed under Section 521(i) for failure to file the schedules required by Section 521(a)(1).  (09-16409, Dkt. No. 21.)

She then filed another Chapter 7 petition in July 2009 (the "Second Petition").  (Case No. 09-22203-bam, Dkt. No. 1.)  The Nevada Law Group continued to represent her, but John E. Cereso ("Cereso") had replaced Crock as Cuomo's attorney of record.  Regarding credit counseling, she certified that she had requested it but was unable to complete it for unstated reasons.  (09-22203, Dkt. No. 1 at 4.)  This conflicted with her assertion in the First Petition that she had in fact completed the counseling.  Cuomo's Schedule F listed 27 unsecured nonpriority claims, one of which was a "Personal Loan" owing to "Pat Richie [*sic*]"for $100,000, which represented 17.9% of Cuomo's unsecured nonpriority claims.[1]  (09-22203, Dkt. No. 15 at 8.)  Ultimately, the case was dismissed in October 2009 for failure to comply with the credit

---

[1]It is undisputed that Patricia Ritchie loaned $96,000 to Cuomo in November 2006 (the "Ritchie Debt").  (Dkt. No. 1 ¶ 4; Dkt. No. 23 at 3.)  The Ritchie Debt is the subject of this adversary proceeding. Gregory Kelly, the plaintiff, acquired Ritchie's interest in the debt in October 2011 and claims that the Ritchie Debt was incurred through fraud.  (Dkt. No. 1.)  Cuomo denies the allegation, but admits that she defaulted on the Ritchie Debt.

1   counseling requirements of Section 109(h).  (09-22203, Dkt. No. 50.)

2        Shortly thereafter, the court sanctioned Cereso and Crock in December 2009 for their

3   conduct in these two cases.  The court ordered disgorgement of all their attorney's fees ($5,000) for

4   violations of (i) Rule 9011, for "later advocating" the Second Petition which contained an untrue

5   statement about Cuomo's completion of credit counseling; (ii) Rule 2016, for failure to file a

6   statement of compensation and for an unreasonable compensation amount; and (iii) Sections 527

7   and 528, for failure to provide Cuomo with various required written disclosures.  (09-16409, Dkt.

8   No. 30.)  Notably, the sanctions do not relate to the veracity or completeness of the information in

9   Cuomo's schedules.

10       With two failed bankruptcy attempts behind her—and the lost time and energy that went

11   with them—Cuomo sought to improve her chances by hiring DeLuca as her new attorney.

12       **B.**    **The Instant Bankruptcy Case**

13       On December 17, 2009, two months after the dismissal of her second bankruptcy attempt,

14   Cuomo had a consultation with DeLuca and Associates, presumably at the firm's office.  The

15   Retainer Agreement includes a clause which purports to place all responsibility for listing creditors

16   on the client:

17         Client will thoroughly review Schedule F which includes the list of creditors.  Client
18         has the *full responsibility* to ensure that all creditors have been listed on Schedule F
            prior to signing the petition. . . .  CLIENT UNDERSTANDS THAT ANY
19         CREDITORS LEFT OFF THE PETITION WILL NOT BE DISCHARGED.[2]

20   (Dkt. No. 45, Doc. 45-4 at 6–7 (emphasis added).)  The Retainer Agreement also separates basic

21

22        [2]The sentence in all capital letters is an incorrect statement of law for two reasons.  First, creditors
23   are not discharged; rather, debts are discharged.  Second, not all unlisted debts are excluded from discharge.
    In Chapter 7 no asset, no bar date cases—like Cuomo's—debts not incurred through fraud, defalcation, or
24   willful and malicious injury are discharged regardless of whether they are scheduled.  11 U.S.C. §§
    523(a)(3)(A), 727(b) (2012); *Beezley v. Cal. Land Title Co. (In re Beezley)*, 994 F.2d 1433, 1434 (9th Cir.
25   1993).  DeLuca appears to be aware of this, as he explained as much in an e-mail he sent to Kelly following
    Kelly's filing of the State Court Action.  (*See* Bankr. Dkt. No. 32, Doc. 32-1 at 11.)  For further explanation
26   of the effects of failing to list a debt, see the "Order Granting in Part and Denying in Part Defendant's
    Motion for Summary Judgment" in this adversary proceeding.  (Dkt. No. 51 at 6–18.)

services from those services that require additional fees:

> BASIC SERVICES: Services to be performed by DeLuca & Associates include:
> a.    Analysis of debtor's financial situation and assistance in determining whether to file a petition under the United States Bankruptcy Code . . .
> b.    Review, preparation and filing of the petition, schedules, statement of affairs, and other documents required by the bankruptcy court;
> c.    Representation at the meeting of creditors.
> d.    Reasonable in person and telephonic consultation with the client. . . .
>
> FRAUD OR OTHER NON-ROUTINE MATTERS.  There are circumstances which may require additional fees.  Additional attorney fees will be charged for additional services including but not limited to: [1] addressing allegations of fraud or non-dischargeability . . . .  ADVERSARY PROCEEDINGS . . . [ARE] SPECIFICALLY EXCLUDED FROM THIS AGREEMENT.

(*Id.* at 5–6.)

Two months later, on March 15, 2010, Cuomo had what DeLuca describes as her "paperwork appointment"—her opportunity "to provide DeLuca & Associates the necessary information to prepare [her] final petition."  (Dkt. No. 45 at 5.)  For her review—to ensure that all creditors were listed—she was given a copy of her credit reports from all three agencies and a draft copy of her Schedule F.  The idea was that she could make any corrections before attending the "signing appointment."  (*See id.*)

On or about March 22, 2012, she attended the "signing appointment."  (*Id.*)  She signed a form titled "Chapter 7 – Schedule F Review," which contained the following language:

> Today is your signing appointment.  The purpose of this appointment is for you to review your petition, sign it, and schedule a date for your bankruptcy to be filed.  Before your meeting today it is necessary that all your creditors are added to your Schedule F.  *If you have not done so already, please take a moment now and make sure all your creditors are added on schedule F.*  (You should have received a copy of your schedule F at your last appointment).

(Dkt. No. 45, Doc. 45-2 at 10 (emphasis added).)  This document does not state that unlisted debts may not be discharged, only that it is "necessary" to list all creditors.  (*Id.*)

On March 23, 2010, Cuomo filed her petition in the instant case (the "Third Petition"), which did not list the Ritchie Debt.  (*See* Bankr. Dkt. No. 1 at 19–36.)  The case seemingly proceeded without a hitch and Cuomo obtained her discharge on July 1, 2010.  (Bankr. Dkt. No.

28.)

    In October 2011, after having acquired Ritchie's interest in the Ritchie Debt, Kelly, as Ritchie's assignee, sued Cuomo in Nevada district court on a breach of contract theory to collect on the debt (the "State Court Action"). (*See* Bankr. Dkt. No. 32, Doc. 32-1.) DeLuca learned of the proceeding and informed Kelly that the Ritchie Debt had been discharged and that Kelly's collection efforts were in violation of the "Bankruptcy Stay." (Bankr. Dkt. No. 32, Doc. 32-1 at 11.) Although his terminology was imprecise, DeLuca was correct; this court has since ruled that the State Court Action was void *ab initio* as violative of the Section 524 discharge injunction. (Dkt. No. 51 at 18.)

    On April 12, 2012, Cuomo filed a motion to reopen the bankruptcy case. (Bankr. Dkt. No. 32.) On April 26, she filed an amended Schedule F listing the Ritchie Debt (the "Amended Third Petition"). (Bankr. Dkt. No. 37.) On May 14, the court granted her motion and reopened the case.

### C.    The Adversary Proceeding

    On June 15, 2012, Kelly timely filed an adversary complaint alleging that the Ritchie Debt was incurred through fraud under Section 523(a)(2)(A) and that discharge should have been denied under Section 727(a). (Dkt. No. 1.)

    Cuomo, representing herself pro se, answered and then filed a motion for summary judgment. (Dkt. Nos. 10, 23.) The court granted in part and denied in part her motion; in short, the Section 523(a)(2)(A) claim survives and trial is set for June 21, 2013. (Dkt. Nos. 19, 51, 99.)

### D.    The Order to Show Cause

    In her motion for summary judgment, Cuomo alleged that she had informed DeLuca of the Ritchie Debt prior to filing the Third Petition by "fill[ing] out all the paperwork of the list of her creditors, including Pat Richie [*sic*]." (Dkt. No. 23 at 5.) She also contended that DeLuca had given her a copy of a pre-filing draft Schedule F listing the Ritchie Debt, which she attached as an exhibit to her motion. (Dkt. No. 23 at 5–6; Doc. 23-1 at 125.) She expressed confusion about why the final version of the Third Petition did not list the Ritchie Debt. (*See* Dkt. No. 23 at 5–6.)

1    Based partly upon these allegations, the court issued the "Order to Show Cause Why

2  Attorney Anthony J. DeLuca Should Not Be Sanctioned for Failing to List a Known Debt on

3  Debtor's Bankruptcy Schedules and Failing to Represent Debtor in this Adversary Proceeding" on

4  March 11, 2013 and an amended order to show cause on March 27 (collectively, the "Order to

5  Show Cause" or "OSC").  (Dkt. Nos. 31, 47.)  The court was concerned that DeLuca had not

6  complied with specific provisions of the Bankruptcy Code, the Bankruptcy Rules, and Nevada's

7  Rules of Professional Conduct, made applicable to this proceeding by Local Rule IA 10-7(a).  The

8  court ordered DeLuca to explain whether (1) he performed competently by failing to list the

9  Ritchie Debt in the Third Petition in light of Cuomo's allegation that he was previously aware of

10  the debt and of the Second Petition's scheduling of the debt; (2) he had charged for his services to

11  reopen the case and amend the schedules, and if so, why he had not filed a supplemental Rule

12  2016(b) statement of compensation; (3) any additional fees were reasonable in the amount; and

13  (4) nonrepresentation in the adversary proceeding was reasonable and whether Cuomo had given

14  informed consent to representation only in the main bankruptcy case.  (Dkt. Nos. 31, 47).  The

15  court set a hearing (the "OSC Hearing") for April 2, 2013.

16    On March 25 and 29, 2013, DeLuca responded to the OSC.  (Dkt. Nos. 45, 49.)  On April 2,

17  the court held the OSC Hearing; DeLuca and Cuomo both appeared.

18    **E.    The Motion to Withdraw**

19    On March 26, 2013, DeLuca moved to withdraw from representing Cuomo.  (Bankr. Dkt.

20  No. 49.)  The next day, he served the motion by first class on Cuomo, Joseph B. Atkins (the trustee

21  in this bankruptcy case), and the U.S. Trustee.  (Bankr. Dkt. No. 51.)  No one filed any written

22  opposition to DeLuca's motion.  The court heard the motion on April 30, and attorney Layne

23  Nordstrom appeared on DeLuca's behalf.  No one appeared to oppose the motion.

24

25

26  **III.    THE PARTIES AND THEIR POSITIONS**

7

### A.    DeLuca's Arguments

#### 1.    Sanctions

Concerning the failure to schedule the Ritchie Debt in the Third Petition, DeLuca makes various arguments.  He first asserts that the Retainer Agreement placed the burden on Cuomo to verify the accuracy of the information in the schedules and informed her of the consequence of failing to list all creditors.  (Dkt. No. 45 at 6–7.)  He next contends that the Ritchie Debt did not appear on Cuomo's credit reports, which he attached to his response.  (*Id.* at 6–7; Doc. 45-1, Ex. I.) He then argues that Cuomo had multiple opportunities to verify the information—at the paperwork appointment and signing appointment—and that she signed the "Chapter 7 – Schedule F Review" form certifying that all her creditors were listed.  (Dkt. No. 45 at 5–6.)  Lastly, even though petitions are filed electronically, DeLuca claims that Cuomo "wet signed" the finalized petition. (*Id.* at 7.)  DeLuca is simply unaware of anything else that he could have done to ensure that the information in her Third Petition was accurate:

> This Court may not simply exonerate Debtor(s) of all accountability for their own bankruptcy filing and their own lives.  Respondent is unaware of anything more reasonable that a bankruptcy law firm could possibly do to assist debtors like Jody Cuomo than attaining their credit reports; emphasizing and reemphasizing the importance of reviewing Schedule F; and advising her of the consequences of failing to list creditors.  Jody Cuomo was given multiple opportunities to review the final Schedule F and *through her sole negligence* did not ensure that a creditor to whom she owed $96,000 was listed.  Since the creditor Patricia Ritchie was not listed on the credit reports it was incumbent upon debtor to advise DeLuca & Associates of the existence of the creditor.

(*Id.* (emphasis added).)

As to the existence of the creditor at issue on the Second Petition, DeLuca argued at the OSC Hearing that his standard practice is to review prior petitions prepared by other attorneys only to verify that a client is eligible under the Code to file for bankruptcy.  He "does not review individual schedules to compare them with a current filing over seven months later."  (Dkt. No. 49 at 2.)  His argument essentially amounts to "things change"—that information in a seven-month-old petition is "stale," and that "[d]uring such a prolonged period of time between petitions, the

1  debtor[']s income, expenses, assets, and virtually every fact of the petition may have changed

2  including the creditors to whom the debtor may owe money.  Debtor's [*sic*] settle claims, pay

3  debts, etc." (*Id.*)  Relying again on the seven-month period between the Second Petition and Third

4  Petition, he points out that the Chapter 7 means test uses only a six-month window. (*Id.*)  He

5  contends that he was hired to prepare Cuomo's new petition, not to "copy the incompetently

6  performed work (as deemed by this Court) of another lawyer[,]" an obvious reference to the

7  sanctions ordered against Crock and Cereso.  (*Id.*)

8         Specifically responding to the court's concern that he violated the duty of competence

9  under Nevada Rule 1.1, DeLuca argues that "reviewing an incompetently drafted and dismissed

10  prior petition was not *reasonably* necessary for the representation of the Debtor." (*Id.* (emphasis in

11  original).)  Likewise, he asserts that it was reasonable to rely on Cuomo's review of the Third

12  Petition to ensure that all creditors were listed.  (*Id.* at 3.)  He even implies that Cuomo may have

13  intentionally omitted the Ritchie Debt.  (*Id.* at 4.)

14         As to Cuomo's allegation that DeLuca had given her a pre-filing draft of the Third Petition

15  listing the Ritchie Debt, DeLuca argues that the document she refers to is actually a copy of the

16  Amended Third Petition.  (*Id.*)  He points to the case number on each page as proof that it was not

17  a pre-filing document, as the court only assigns case numbers upon case filing.  (*Id.*)  He also

18  contended at the OSC Hearing that it would require an overt act to omit a debt that appears on a

19  pre-petition draft from the filed version, and that the court should not presume such an act without

20  clear evidence.

21         DeLuca also argues that Cuomo requested the document in November 2012, and at that

22  time, the only document he could have provided her was a copy of the Amended Third Petition.

23  (*Id.*)  This is so, he contends, because the software he uses to prepare petitions, Best Case, always

24  overwrites prior versions of a petition once changes are made.  (*Id.*)  He expressed profound

25  confusion as to how the court could not be aware of this alleged aspect of Best Case's

26  functionality.  (*Id.*)

9

1    DeLuca builds on this point to argue that Cuomo is perpetuating a fraud on this court by

2  falsely claiming that the Amended Third Petition is a pre-filing draft.  (*Id.* at 5.)  He bolsters this

3  argument by pointing to Cuomo's prior inconsistent statements in the First Petition and Second

4  Petition about whether she had received credit counseling.  (*Id.* at 5–6 ("How many times will this

5  Court allow Jody Cuomo to deceive this Court?").)  Accordingly, he "requests this matter be

6  referred to the U.S. Department of Justice, or any body this Court deems appropriate to pursue

7  Debtor Cuomo for criminal prosecution on counts of perjury and fraud [and that] this Court issue

8  an Order to Show Cause Why Jody Cuomo should not be sanctioned for committing fraud and

9  perjuring herself before this Court."  (*Id.* at 8.)

10    As to the issue of DeLuca's attorney's fees, he states that he has not received any

11  compensation for his post-discharge services and thus no supplemental Rule 2016(b) disclosure

12  statements were required.  (Dkt. No. 45 at 7–8.)  Further, DeLuca requests that the court order

13  Cuomo to pay all of his attorney's fees for his post-discharge work, including his efforts to respond

14  to the OSC which he claims "stem[s] from Defendant Cuomo's . . . fraudulent allegations."  (*Id.* at

15  11.)

16    As to the nonrepresentation in this adversary proceeding, he contends that he offered to

17  represent Cuomo but she could not afford it.  He asserts that he "sent debtor a letter of non-

18  representation in the adversary as the firm could not continue to work endlessly for debtor Jody

19  Cuomo without compensation."  (*Id.* at 8–9.)  The date and precise content of this letter are

20  unknown, however, as DeLuca has not submitted it to the court.

21    Finally, DeLuca contends that this court is "specifically targeting" him and his firm.  (Dkt.

22  No. 49 at 4.)  In his response to the OSC, he asserted that "the hearing scheduled for April 2, 2013

23  appears to be nothing more than a legal formality necessary for a predetermined decision of this

24  Court to sanction Respondent on *some* basis."  (*Id.* (emphasis in original).)  This conclusion rests

25  on allegations that (i) the court ignored the "irrefutable evidence that Cuomo committed a fraud

26  upon this Court" by submitting the alleged pre-filing draft petition; (ii) to prepare the Amended

10

1   OSC after he had responded to the first OSC, the court must have "actively re-reviewed the file to

2   find some other way in which it could possibly justify sanctioning Respondent;" and (iii) the court

3   should not have believed Cuomo's allegations in light of her previous lie to the court about the

4   credit counseling certificate.  (*Id.* at 4–6.)

5                   **2.      Motion to Withdraw**

6          DeLuca's principal argument is that he and Cuomo have "irreconcilable differences."

7   (Bankr. Dkt. No. 49 at 1.)  He also contends that (i) he properly noticed the debtor and opposing

8   counsel; (ii) his withdrawal will not cause any delay; and (iii) Cuomo, on multiple occasions,

9   denied his offers for representation in the adversary proceeding

10         **B.      Cuomo's Contentions**

11         Cuomo did not file any papers in response to the OSC, but she did argue on her own behalf

12  at the OSC Hearing.  To summarize her points, she contends that (i) the exhibit she attached to her

13  motion for summary judgment and described as a pre-filing draft petition was not false; (ii) she

14  obtained that document from a secretary in DeLuca's office in November 2012; (iii) she gave

15  DeLuca a list of creditors that included the Ritchie Debt before filing the Third Petition; (iv) she

16  has not committed any fraud on the court; (v) she is the victim of two terrible attorneys, neither of

17  which could perform a relatively simple Chapter 7 case; and (vi) she has never spoken directly

18  with DeLuca and had never even seen him until the OSC Hearing.

19         Cuomo did not file any papers concerning the motion to withdraw, and she did not appear

20  at the hearing on the motion to withdraw.

21         **C.      Factual Findings**

22         There is considerable disagreement about the nature of the alleged pre-filing draft

23  petition—more specifically, whether it is in fact a pre-filing draft or a copy of the Amended Third

24  Petition.  Based on the appearance of the case number on every relevant page of the document and

25  the equality of creditors on the alleged pre-filing draft and the Amended Third Petition, the court

26  finds that it is a copy of the Amended Third Petition.

                                        11

1    This does not necessarily mean, however, that Cuomo acted in bad faith by asserting

2    otherwise.  The court believes that she entered DeLuca's office in November 2012 and asked for a

3    copy of the pre-filing draft, and that the secretary gave her the then-current version of her petition.

4    In other words, Cuomo believed this document to be what she purported it to be based on the

5    response from DeLuca's own staff.  That being said, the court does not believe that DeLuca, or his

6    office staff, acted in bad faith either by giving her the Third Amended Petition.  It was likely the

7    document most readily available, and possibly DeLuca did not have a copy of the pre-filing draft

8    petition available.

9    That DeLuca may not have had a copy of the pre-filing document available does not mean

10    that, as he asserts, it was "factually impossible" to have it available.  (Dkt. No. 45 at 10.) Like most

11    filing software, Best Case software allows users to save an archive copy of any document at any

12    time.  If a document is altered before an archive version is created, however, the prior version is

13    lost.  To file a document with the court, the user must create a PDF file, which the system

14    automatically archives unless instructed otherwise.  In short, the user decides when and what to

15    archive.  If documents are automatically overwritten or deleted in DeLuca's computer system once

16    modified, that is by his choice.

17    At the OSC Hearing, DeLuca asserted that there would be no purpose to save prior drafts.

18    He argued that it would not be pragmatic because there would be hundreds of versions of each case

19    and his computer servers would be overwhelmed.  He said that he does not know of any profession

20    where rough drafts are saved.  The court is not in a position to attest to the routine practice of

21    lawyers and other professionals concerning electronic document archives, but there are certainly

22    some lawyers that save draft documents and there is undoubtedly value in doing so because later it

23    might be necessary to see what was changed and why.

24    The next factual issue concerns the level of personal attention that DeLuca gave to Cuomo.

25    At the OSC Hearing, Cuomo argued that she had never met or spoken with DeLuca and that the

26    OSC Hearing was the first time she had ever seen him.  DeLuca did not rebut this assertion.

1    Accordingly, the court finds that DeLuca never personally met with Cuomo, or even talked with

2    her over the phone, during the course of representation.

3    **IV.    LEGAL ANALYSIS**

4         **A.    Sanctions**

5              **1.    "Specifically Targeting" DeLuca and His Firm**

6         Before addressing the statutes and rules at issue, it is necessary to address DeLuca's

7    allegation that the court is specifically targeting him.[3]  DeLuca raised this contention in a motion to

8    recuse, filed after this matter was taken under submission.  Although the norm is that the judge

9    sought to be recused should decide such a motion, *Bernard v. Coyne (In re Bernard)*, 31 F3d. 842,

10   843 (9th Cir. 1994), this court referred the matter to the Chief Bankruptcy Judge for this district,

11   the Honorable Mike K. Nakagawa.  (Dkt. No. 76).  That referral occurred on May 23, 2013, and

12   Chief Judge Nakagawa heard it on May 29, 2013.  He entered his order denying the motion to

13   recuse on June 3, 2013 (Dkt. No. 86).  He also entered a 11-page memorandum outlining his

14   reasoning (Dkt. No. 85).  This court incorporated that memorandum in this decision as though set

15   forth in full.

16        In the present matter, the court was troubled by the appearance of the Ritchie Debt on the

17   Second Petition and its subsequent omission from the Third Petition, Cuomo's pro se status in the

18   adversary proceeding, and the lack of a supplemental Rule 2016(b) statement.  Now that the court

19   has heard arguments from all those who wished to present them, it can review DeLuca's conduct *in

20   this case* and determine whether sanctions should be imposed.

21

22

23

24        [3]This assertion is somewhat odd, given that this court has issued at least one order to show cause

25   against DeLuca and did not pursue the matter when DeLuca adequately explained his actions.  *E.g., In re

     Wallace*, No. 06-12285-bam, Dkt. Nos. 29, 32 (court stated on the record at the hearing on March 14, 2007

26   that DeLuca's conduct did not warrant sanctions).

13

### 2.    Interplay Between State and Federal Law

Attorneys practicing in this court must adhere to the standards of conduct prescribed by the Nevada Rules of Professional Conduct.  Local Rule IA 10-7(a).  The Nevada Rules of Professional Conduct in turn are based on, and largely identical to, the ABA Model Rules of Professional Conduct.  The State of Nevada has not adopted the official comments to the ABA Model Rules; however, the comments "may be consulted for guidance in interpreting and applying the Nevada Rules of Professional Conduct, unless there is a conflict between the Nevada Rules and the . . . comments."  NEV. RULE OF PROF'L CONDUCT 1.0A (2011).

### 3.    Nev. Rule of Prof'l Conduct 1.1 — Duty of Competence

#### a.    Legal Standard

Under Nevada Rule 1.1, which is identical to ABA Model Rule 1.1, "[a] lawyer shall provide competent representation to a client . . . the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."  NEV. RULE OF PROF'L CONDUCT 1.1 (2011).  "Competent handling of a legal matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners."  ABA MODEL RULE 1.1 cmt. 5.  "The interrelated obligations of thoroughness and preparation require a lawyer to investigate all relevant facts . . . ."  AM. BAR ASS'N, ANNOTATED MODEL RULES OF PROF'L CONDUCT 23 (2011) ("ANNOTATED RULES"); *see* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 16 cmt. d (lawyer must perform "appropriate factual research" called for by the client's objectives); 1 THE LAW OF LAWYERING § 3.2 (Geoffrey C. Hazard, Jr. & W. William Hodes, 3d ed. 2012) ("[F]ailure to inquire into key facts . . . may . . . be [a] violation[] of [ABA Model] Rule 1.1.").  "The level of competency heightens as the complexity and specialized nature of the matter increase."  *In re Slabbinck*, 482 B.R. 576, 590 (Bankr. E.D. Mich. 2012).

Whether a lawyer fulfilled the duty of competence depends on the client's objectives.  *See In re Egwim*, 291 B.R. 559, 569–73 (Bankr. N.D. Ga. 2003); *In re Castorena*, 270 B.R. 504,

14

526–30 (Bankr. D. Idaho 2001); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 16 cmts. c, d. (2000).  To determine the client's objectives, a lawyer must properly communicate with the client to understand the client's expectations, learn about the client's particular legal and financial situation, and independently investigate any "red flag" areas.  *See* STATE BAR OF CAL., COMM. ON PROF'L RESPONSIBILITY & CONDUCT, AN ETHICS PRIMER ON LTD. SCOPE LEGAL REPRESENTATION 1–2 (2004) ("CAL. ETHICS PRIMER").

A bankruptcy lawyer cannot assume that a client knows what a bankruptcy will or will not do for her.  She may understand that bankruptcy eliminates some debts but is unlikely to know anything else about bankruptcy or even whether she wants or needs to file.  For this reason, laypersons seek the advice of bankruptcy lawyers.  *See Danvers Savs. Bank v. Cuddy (In re Cuddy)*, 322 B.R. 12, 17 n.18 (Bankr. D. Mass. 2005) ("YES, you do need a lawyer in a bankruptcy case." (internal quotation marks and citation omitted)); *Nichols v. Keller*, 19 Cal. Rptr. 2d 601, 609, 15 Cal. App. 4th 1672, 1686 (1993) ("A trained attorney is more qualified to recognize and analyze legal needs than a lay client, and, at least in part, this is the reason a party seeks out and retains an attorney to represent and advise him or her in legal matters.").

Unless a client indicates otherwise, her principal objective in bankruptcy is the discharge of all dischargeable debts.  *See Schwab v. Reilly*, 130 S. Ct. 2652, 2667 (2010) ("fundamental bankruptcy concept of a fresh start" (internal quotation marks and citation omitted)); *In re French*, 20 B.R. 155, 156 (Bankr. D. Or. 1982) ("The overriding purpose of all bankruptcy laws is to relieve the debtor from the weight of oppressive indebtedness and to provide him with a fresh start.") (citing *Perez v. Campbell*, 402 U.S. 637 (1971)); *cf. In re Jackson*, 184 F.3d 1046, 1052 (9th Cir. 1999) ("Exceptions to discharge must be construed narrowly.").

Because Cuomo did not express any particular goals, DeLuca was obligated to provide whatever services were reasonably necessary to achieve the discharge of all of Cuomo's dischargeable debts.  To determine what those services were, he needed to investigate all relevant facts and communicate with Cuomo to learn about her particular legal and financial situation.

15

### b. Application

Had Cuomo not previously filed for bankruptcy or had the Second Petition not been reasonably available to DeLuca, the inquiry would end here. He obtained Cuomo's credit reports from three bureaus, none of which listed the Ritchie Debt, and he gave her repeated opportunities to review the pre-filing information. (Doc. 45-2 at 12–25.) Although his procedures are somewhat lacking in that the consequence of failing to list a creditor is mentioned in the Retainer Agreement but not in the "Chapter 7 – Schedule F Review" form, they are sufficient to fulfill the duty of competence in the usual run of events. Cuomo's case did not align with the prototypical Chapter 7 debtor though, and this situation represents what can go awry when an attorney's practices are designed for a volume operation rather than for individualized client attention.

The thoroughness required under Nevada Rule 1.1 mandates that an attorney take reasonable steps to ensure that all of a client's creditors are listed on Schedule F. *See* NEV. RULE OF PROF'L CONDUCT 1.1 (2011). While some debts are discharged even if unscheduled, a debtor only receives the full protection of bankruptcy for scheduled debts. For example, when debts are properly scheduled, the deadline to file dischargeability complaints is established. FED. R. BANKR. P. 4007. The certainty of the "fresh start" is therefore best ensured. *See Schwab v. Reilly*, 130 S. Ct. at 2667. The bankruptcy attorney is the expert and to properly serve his client, he must not merely react to what the client presents him. Rather, he must proactively perform independent research into the relevant facts and relevant law. ANNOTATED RULES 23; HAZARD & HODES § 3.2; *see* NEV. RULE OF PROF'L CONDUCT 1.1 (2011).

The existence and identity of those creditors listed on the Second Petition were relevant facts necessary to a full understanding of Cuomo's individual legal and financial situation. *See* ANNOTATED RULES 23 (citing *In re Dean*, 401 B.R. 917, 923, 925–26 (Bankr. D. Idaho 2008) (sanctioning attorney for violating duty of competence by filing bankruptcy petition without investigating whether security interest in clients' motor home was perfected); *Toledo Bar Ass'n v. Wroblewski*, 515 N.E. 2d 978, 978, 32 Ohio St. 3d 162, 162 (1987) (sanctioning probate attorney

16

1    for failure to investigate whether decedent was survived by next of kin and failure to properly

2    inventory decedent's bank accounts); *In re Disciplinary Proceedings against Winkel*, 577 N.W. 2d

3    9, 11, 217 Wis. 2d 339, 342–43 (1998) (sanctioning attorney for failure to obtain information about

4    funds held in trust by clients' business before clients surrendered assets to bank)).

5        Lawyers also owe a duty of trust to their clients.  *U.S. Trustee v. Jones (In re Alvarado)*,

6    363 B.R.484, 490 (Bankr. E.D. Va. 2007); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS

7    § 16 cmt. b (2000).  Part of that trust is the client's reasonable expectation that lawyers will help

8    correct mistakes and inform clients of facts which they overlook or simply do not understand are

9    relevant.  Although Cuomo should have realized that the Ritchie Debt was not listed on her Third

10   Petition, she was not in a position to understand the legal importance of that omission in light of

11   the fact that it was listed on a prior petition.

12       A lay client may believe that a court already "knows" about a previously-listed debt and

13   that re-listing it is not necessary or may believe that her attorney has reviewed her prior petitions

14   and determined that re-listing the debt is likewise unnecessary.  Whether Cuomo believed this is

15   unknown, but as the expert, DeLuca had the obligation to communicate to her the effect of

16   omitting a debt that was previously listed to determine whether she still wanted to omit it.  Maybe

17   Cuomo simply forgot about the Ritchie Debt or was preoccupied with other things when she

18   verified the accuracy of the Third Petition.  DeLuca is not responsible for facts that he could not

19   have reasonably known, but he is responsible to provide professional counsel which includes

20   catching a client's reasonably knowable error.

21       DeLuca's assertion that "things change" made a face-to-face meeting—which never

22   happened—all the more important.  Within several minutes, he could have asked her what had

23   happened with the Ritchie Debt—for example, whether the creditor had forgiven it or whether she

24   had paid it.  He had the duty to determine whether anything had changed since the prior petitions.

25   In other words, reviewing the prior petitions was a "method[] and procedure[]" necessary to

26   determine the legal and factual elements of Cuomo's problem.  ABA MODEL RULE 1.1 cmt. 5.

1    The existence of the Ritchie Debt was certainly a relevant fact, as borne out by the present

2    adversary proceeding which could have been avoided had the Ritchie Debt been listed.  *See*

3    ANNOTATED RULES 23; HAZARD & HODES § 3.2.  Even without the benefit of hindsight though, the

4    Ritchie Debt was a relevant fact because it constituted just over half (56%) of Cuomo's overall

5    debt.  Moreover, any debt listed on a schedule in the recent past is a relevant fact because it

6    contributes to the attorney's holistic understanding of a client's legal and financial situation.  In

7    order to achieve the objective of discharging all of a client's dischargeable debts, DeLuca was

8    obligated to take reasonable steps to determine what those debts were.  DeLuca had actual

9    knowledge of the Second Petition.  But even if not, it was reasonably available through the court's

10   PACER system of electronic records.  *See In re Alessandro*, 2010 WL 3522255 at *3 (Bankr.

11   S.D.N.Y. 2010); ANNOTATED RULES 23–24 (citing *People v. Boyle*, 942 P.2d 1199, 1201 (Colo.

12   1997) (en banc) (sanctioning attorney for "fail[ure] to discover and present readily available

13   evidence supporting the asylum petition")).  To say the least, cross-checking the Second Petition

14   with the Third Petition was a reasonable step to ensure that all dischargeable debts were scheduled.

15       DeLuca cannot by contract limit the scope of his duties such that he serves essentially as a

16   bankruptcy petition preparer who is responsible only to transcribe onto the Schedule F whatever

17   debts are specified by the client.  *See In re McKain*, 325 B.R. 842, 849 (Bankr. D. Neb. 2005)

18   ("Clearly, the debtor is ultimately responsible for the veracity of the information contained in her

19   bankruptcy schedules. . . . A debtor's attorney also bears a significant degree of responsibility in

20   assuring to the best of his or her ability that the schedules are complete and accurate before they

21   are filed.") (citing 4 COLLIER ON BANKRUPTCY ¶ 521.03[3] (15th ed. rev. 2005)); *U.S. Trustee v.*

22   *Lynn (In re Bellows-Fairchild)*, 322 B.R. 675, 680 (Bankr. D. Or. 2005).  The current version of

23   Collier on Bankruptcy puts it this way:

24       In the preparation of the schedules nothing should be taken for granted.  The
         attorney should carefully investigate the affairs of the debtor and make certain that
25       the attorney has all the information needed to prepare full and complete schedules,
         for it is the duty of the debtor to present intelligible and true schedules.

26

18

1    4 COLLIER ON BANKRUPTCY ¶ 521.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.
2    2013).

3        While Cuomo bears ultimate responsibility for the information in her schedules, DeLuca
4    played a crucial role as her agent and fiduciary.  The Retainer Agreement goes a step too far by
5    purporting to place *all* responsibility for listing creditors on Cuomo.  *See* RESTATEMENT (SECOND)
6    OF CONTRACTS § 193 (1981) ("A promise by a fiduciary to violate his fiduciary duty or a promise
7    that tends to induce such a violation is unenforceable on grounds of public policy."); *Neubauer v.*
8    *Goldfarb*, 133 Cal. Rptr. 2d 218, 225, 108 Cal. App. 4th 47, 57 (2003).  Where the client is the
9    only source of such knowledge, this clause is sensible; an attorney cannot pry open a client's mind
10   to see what information is being withheld.  But taken at its face, this clause even excuses DeLuca
11   from correctly transcribing the information in the credit reports.  By contract, he purports to have
12   no obligation to perform any independent research however easy or inexpensive it may be; the
13   client cannot trust that he will correctly list any creditors on Schedule F or correct any of the
14   client's errors.  DeLuca cannot contract away the thoroughness mandated by Nevada Rule 1.1.  *See*
15   RESTATEMENT (SECOND) OF CONTRACTS § 193 (1981).  If DeLuca seeks to perform the duties of a
16   bankruptcy petition preparer who merely transcribes client-provided information, then he should
17   charge fees that so reflect.  *See* 11 U.S.C. § 110 (2012).

18       DeLuca rightly refused to copy the work of incompetent attorneys, but oddly accepted the
19   passive role of relying solely on information provided by Cuomo—an inexpert in bankruptcy
20   procedure or substance.  *See* ANNOTATED RULES 24 (citing *In Re Disciplinary Proceedings against*
21   *Fischer*, 499 N.W. 2d 677, 677–69, 176 Wis. 2d 145, 145–49 (1993) (sanctioning attorney for
22   signing and filing complaints prepared by third parties without independently investigating the
23   clients' case files)).  In essence, DeLuca purports to contract away his obligation to give legal
24   advice based on the client's overall situation in favor of responding only to what the client
25   provides.  This inappropriately put Cuomo in a position in which she could not trust a professional
26   whose predominant fiduciary duty is the duty of trust.  *See In re Alvarado*, 363 B.R. at 490.

1   DeLuca's arguments are of no avail.  The marginal expense of cross-checking prior

2   schedules is far outweighed by the duty to provide competent representation by thoroughly

3   investigating relevant facts.  Not all clients have past filings, so the expense would not be incurred

4   in every case.  DeLuca argued that the Third Petition has over one hundred creditors, but the

5   Second Petition had only 27.  The comparison work is ministerial and could be done by a

6   paralegal.  The expense of cleaning it up later is much greater than doing it right the first time;

7   DeLuca himself admits that he spent considerable efforts to reopen the case and amend the

8   schedules.  (Dkt. No. 45 at 8–9.)

9   DeLuca points to the unethical conduct of Cuomo's former attorneys to justify his

10   ignorance of the prior schedules.  Yet he also stated that as a matter of practice he does not look at

11   prior schedules, so it does not appear to really matter who prepared them.  When the Third Petition

12   was prepared, the decision to ignore Cuomo's prior schedules was not based on Crook's and

13   Cereso's conduct but rather DeLuca's general office practice.  The present reliance on Crook's and

14   Cereso's unethical conduct seems to be a post hoc rationalization to justify DeLuca's inattention to

15   detail.  That the former attorneys were sanctioned is good reason to be skeptical of their work, but

16   it does not excuse completely ignoring it.

17   The court agrees with DeLuca that it would have been unreasonable for him to *copy* the

18   Second Petition, because it was prepared by incompetent counsel and it is correct that "things

19   change."  But he did have the duty to *review* the Second Petition with Cuomo.  Had he done so, he

20   would have discovered that the debt was still owing and would have scheduled it (assuming with

21   little doubt that Cuomo would have agreed to schedule it).  She thus would have benefitted from

22   Rule 4007's deadline for dischargeability complaints and she may not be embroiled in this

23   adversary proceeding.  While the court cannot state whether Kelly would have acquired the Ritchie

24   Debt and timely brought his nondischargeability action had the debt been properly scheduled in the

25   Third Petition, Cuomo at least would have enjoyed the protection Rule 4007's deadlines.  Rule

26   4007(b)–(d).  And this protection is part of the overall benefit of bankruptcy that DeLuca was

20

obligated to provide as an experienced consumer bankruptcy attorney.  Even if Cuomo understood

that unscheduled debts may not be discharged, she cannot be expected to understand the complex

relationship between unscheduled debts, Section 523, and Rule 4007 that governs

nondischargeability complaints.

For the reasons stated above, DeLuca violated Nevada Rule 1.1.

### 4.    Nev. Rule of Prof'l Conduct 1.2 — Scope of Services

#### a.    Legal Standard

The practice of providing limited legal services, colloquially known as "unbundling," is

permissible only if "the limitation is reasonable under the circumstances and the client gives

informed consent."  NEV. RULE OF PROF'L CONDUCT 1.2(c).[4]  Unbundling is further defined as

"dividing comprehensive legal representation into a series of discrete tasks, only some of which the

client contracts with the lawyer to perform."  Amber Hollister, *Limiting the Scope of*

*Representation: Unbundling Legal Servs.,* 71 OR. ST. B. BULL. 9, 9 (2011).

#### b.    Application

In a recent opinion sanctioning DeLuca for unbundling representation in adversary

proceedings, he had excluded adversary proceedings from his flat fee and altogether refused to

provide the extra services.  Here, the Retainer Agreement is identical in relevant respects, but his

conduct differed in that he offered to provide the extra services to Cuomo but she declined them as

unaffordable.  That distinction is crucial.  By offering adversary representation (albeit for an extra

fee), he effectively chose not to unbundle his services.  The Retainer Agreement separates basic

services from additional services for attorney's fee purposes, but it nonetheless affords a full range

of services.  *See In re Egwim*, 291 B.R. 559, 573 (Bankr. N.D. Ga. 2003) (stating that extra fees

may be charged for adversary representation); *accord In re Seare*, 12-01108, Dkt. No. 59 at 30.

---

[4]For an extended discussion of unbundling, including the competing policy concerns, see *In re Seare*, 12-01108, Dkt. No. 59 at 23–30.

1  Thus, DeLuca did not place a limitation on services that would trigger the requirements of Nevada

2  Rule 1.2.  Accordingly, he did not violate Nevada Rule 1.2(c) by refusing to provide adversary

3  representation when Cuomo could not afford it.

4          **5.**        **Nev. Rule of Prof'l Conduct 1.5 / Rule 2016 — DeLuca's Fees**

5  Since DeLuca did not charge any fees for his post-discharge work to reopen the case and

6  amend the schedules, Nevada Rule 1.5 and Bankruptcy Rule 2016 are not implicated. NEV. RULE

7  OF PROF'L CONDUCT 1.5 (2011); FED. R. BANKR. P. 2016.  Accordingly, he violated neither.

8  As to DeLuca's request for attorney's fees from Cuomo for his post-discharge services to

9  reopen the case and amend the schedules, the court rejects it.  His response to the OSC is not a

10  proper fee application under Section 329 and Rule 2016.  He did not include a "detailed statement

11  of . . . the services rendered, time expended, . . . expenses incurred, and . . . the amounts requested"

12  as required. FED. R. BANKR. P. 2016(a).  He may be entitled to fees under the Retainer Agreement,

13  but his apparent frustration with Cuomo's lack of payment is largely due to his own choice to

14  perform these services without a retainer and cannot be remedied with an improper fee application.

15  Regarding the time expended to respond to the OSC, the court's decision to issue the OSC

16  did not flow from any fraud by Cuomo and thus she is not responsible for any of DeLuca's related

17  fees.[5]  Moreover, the court finds that DeLuca's conduct in this case is sanctionable as he failed to

18  discharge the duties he owed to Cuomo.  Requiring Cuomo to pay his fees would be absurd, and

19  there is no legal basis to do so.

20          **6.**        **Section 707(b)(4)(C)**

21          **a.**        **Legal Standard**

22  "The signature of an attorney on a [Chapter 7] petition . . . shall constitute a certification

23  that the attorney has . . . performed a *reasonable investigation* into the circumstances that gave rise

24

25

26       [5]The court expresses no opinion about whether Cuomo would be responsible for DeLuca's fees had she committed fraud upon the court.

to the petition . . . ."  11 U.S.C. § 707(b)(4)(C) (2012) (emphasis added).  The "reasonable investigation" under this section is indistinct from the "reasonable inquiry" under Rule 9011, and Rule 9011 case law is applicable.  *In re Kayne*, 453 B.R. 372, 381 (B.A.P. 9th Cir. 2011); *In re Withrow*, 405 B.R. 505, 511–12 (B.A.P. 1st Cir. 2009); *see* 6 COLLIER ¶ 707.05[1]; *Attorney Liability Under Section 707(b)(4) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 61 BUS. LAW 697, 703 (2006) ("*ABA Attorney Liability*").  The attorney must perform an objectively reasonable investigation into the circumstances giving rise to the petition, assessed at the time the petition was filed.  11 U.S.C. § 707(b)(4)(C) (2012); *ABA Attorney Liability* 703; *see Hamer v. Career College Ass'n*, 979 F.2d 758, 759 (9th Cir. 1992) (discussing Civil Rule 11). The attorney cannot take all of the client's assertions at face value nor rely solely upon the information provided by the client.  *See In re Kayne*, 453 B.R. at 385; *ABA Attorney Liability* 705. The attorney is the expert and cannot rely upon a client's limited understanding of what constitutes the "complete" or "necessary" information that the attorney must have nor what information is or is not relevant to the client's particular situation.  *See In re Seare*, 12-01108, Dkt. No. 59 at 62–66.

### b.    Application

DeLuca did not perform a meaningful independent investigation into the circumstances giving rise to Cuomo's bankruptcy petition.  He only reviewed past filings to determine her eligibility without any review of her prior schedules.  He relied solely on the information she provided about her creditors.  Broadly put, the circumstance that drove her to bankruptcy was total debt of approximately $160,000 [verify this number], only about $60,000 of which appeared on the Third Petition.  Had he performed a reasonable investigation by reviewing the prior petition, he would have discovered that about one-third of her debt did not appear on the Third Petition.  He even admitted at the OSC Hearing that the Ritchie Debt was a "substantial" part of her total debt.

Other bankruptcy courts have rejected blame-the-client arguments similar to DeLuca's in the context of Section 707(b)(4)(C).  *In re Withrow* rejected an attorney's argument that he failed to schedule recently closed bank accounts due to the debtor's poor health and faulty memory.  405

23

1    B.R. at 513.  Whatever errors may have been directly attributable to faulty information from the

2    client, they were not sufficient to overcome the attorney's "sloppy and careless actions (or

3    inactions) . . . ."  *Id.*  The attorney failed to reasonably investigate the underlying facts, and the

4    court sanctioned him under Section 707(b)(4)(C) and Rule 9011.  *Id.* at 514.

5         *In re Moffett* rejected a lawyer's similar justification for failing to schedule a substantial

6    asset:

7              What [the attorney] misses, however, is that the Debtor provided exactly what she
             was told she had to provide to get her case filed.  The fault for the lack of complete
8              information rests with [the attorney] for not insisting that clients he represents be
             told — and required — to bring in all necessary information before a case will be
9              filed.  He cannot absolve himself of the duty to conduct a reasonable investigation
             [under § 707(b)(4)(C)] by affirmatively allowing clients to bring in only the bare
10            minimum of information and then claiming that it is not his fault that he did not
             have sufficient information to review.

11

12   2012 WL 693362 at *3.  While *In re Moffett* is not on all fours with the instant matter, its lesson is

13   instructive.  An attorney cannot place the entire burden on the clients to provide information.  The

14   statutory duty of reasonable investigation survives whatever investigative limitation an attorney

15   purports to impose by contract.  *See* 11 U.S.C. § 707(b)(4)(C) (2012); *Decoria v. Cnty. of

16   Jefferson*, 2008 WL 130919 at *1 (D. Idaho 2008); *Liebenstein v. Crowe*, 826 F. Supp. 1174, 1189

17   (E.D. Wis. 1992) ("[Defendant] Port Washington may not contract away its . . . duties [to

18   indemnify] when there is a statute specifically addressing this duty."); *Burris v. Am. Chicle Co.*, 33

19   F. Supp. 104, 108 (E.D.N.Y. 1940); *In re U.S. Lines, Inc.*, 103 B.R. 427, 431 n.1 (Bankr. S.D.N.Y.

20   1989).  Cuomo did everything that DeLuca told her to do.  She reviewed the draft petitions in good

21   faith and unfortunately failed to spot the omitted Ritchie Debt.  As under Nevada Rule 1.1, DeLuca

22   nonetheless had the affirmative duty under Section 707(b)(4)(C) to go beyond the information

23   provided by Cuomo and, at the very least, to ask why the Ritchie Debt was omitted.

24        For these reasons, DeLuca violated Section 707(b)(4)(C).

25

26

24

### 7.    The Sanctions Imposed

#### a.    The Purpose of Sanctions

A lawyer's primary obligations are to her client, but she also owes duties to the public, the legal system, and her profession.  The ABA has recognized this in articulating that "the purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession."  AM. BAR. ASS'N, JOINT COMM. ON PROF'L SANCTIONS, STANDARDS FOR IMPOSING LAWYER SANCTIONS 13 (2005) (the "ABA STANDARDS").  The *ABA Standards* were developed to address ethical violations — noncompliance with the ABA Model Rules and their state corollaries. In determining sanctions for such violations, deterrence is the essential goal — protection from actual and potential rulebreakers.

Likewise, the court may remedy violations of Section 707(b)(4)(C) by ordering sanctions with the predominant purpose of deterrence. *In re O'Brien*, 443 B.R. 117, 144 (Bankr. W.D. Mich. 2011); *In re Robertson*, 370 B.R. 804, 809 n. 8 (Bankr. D. Minn. 2007); *see In re Kayne*, 453 B.R. 372, 382; *In re Withrow*, 405 B.R. at 515.

#### b.    The Range of Sanctions

"Bankruptcy courts have the inherent authority to regulate the practice of attorneys who appear before them." *In re Nguyen*, 447 B.R. 268, 280 (B.A.P. 9th Cir. 2011) (en banc) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–45 (1991)).  "Bankruptcy courts . . . have express authority under the Code and the Rules to sanction attorneys, including disbarment or suspension from practice" *Id.* at 281 (citing *Price v. Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1058, 1062 (9th Cir. 2009)); 11 U.S.C. § 105(a) (2012) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].").  "The bankruptcy court has wide discretion in determining the amount of a sanctions award." *In re Kayne*, 435 B.R. at 386 (internal quotation marks and citation omitted); *see In re Withrow*, 405

25

1  B.R. at 514.

2      The Ninth Circuit BAP has endorsed the use of the *ABA Standards* to determine the

3  appropriate sanctions for attorney misconduct.  *See In re Nguyen*, 447 B.R. at 277 (holding that

4  although failure to follow the *ABA Standards* is not an abuse of discretion, they remain a "helpful

5  guide in the imposition of sanctions").

6      The *ABA Standards* includes a non-exhaustive list of potential sanctions which the court

7  may impose individually or collectively: (1) disbarment; (2) suspension; (3) interim suspension; (4)

8  reprimand, a declaration that the lawyer's conduct was improper without limiting the lawyer's right

9  to practice; (5) admonition, a non-public reprimand; (6) probation, which allows the lawyer to

10  practice under specified conditions; (7) reciprocal discipline; and (8) various other sanctions and

11  remedies, such as restitution, assessment of costs, limitation upon practice, appointment of a

12  receiver, requiring that the lawyer take the bar examination or professional responsibility

13  examination, or requiring that the lawyer attend continuing education courses.  ABA STANDARDS

14  14–16.

15      The Local Rules for the District of Nevada also grant considerable leeway in fashioning

16  sanctions for violations of the Nevada Rules of Professional Conduct.  Local Rule 1A 10-7 ("[A]ny

17  attorney who violates these standards of conduct may be disbarred, suspended from practice before

18  this Court for a definitive time, reprimanded or subjected to such other discipline as the Court

19  deems proper.").

20      Section 329(b) and Rule 2017 provide independent bases for the court to examine the

21  reasonableness of attorney's fees.  11 U.S.C. § 329(b) (2012); FED. R. BANKR. P. 2017.  If the court

22  determines that the "compensation exceeds the reasonable value" of the attorney's services, it may

23  cancel the retainer agreement or order disgorgement.  11 U.S.C. § 329(b) (2012).

24      Courts have awarded a variety of sanctions for the violations that DeLuca has committed.

25  For violations of the duty of competence, courts have ordered attorneys suspended from practice,

26  disgorged fees (partially and fully), ordered payment of the costs of the disciplinary proceeding,

26

1    and ordered public reprimands.  *See In re Discipline of Peirce*, 128 P.3d 443, 445, 122 Nev. 77, 81

2    (2006); *In re Ohpark*, 2010 WL 1930187 at \*2; *In re Dean*, 401 B.R. at 919; *Boyle*, 942 P.2d at

3    1204; *Wroblewski*, 512 N.E. 2d at 164; *In re Disciplinary Proceedings against Winkel*, 577 N.W.

4    2d at 10; *In re Disciplinary Proceedings against Fischer*, 499 N.W. 2d at 152–53.

5        For violations of Section 707(b)(4), courts have suspended an attorney's filing privileges,

6    ordered continuing education courses, disgorged attorney's fees under Section 329(b) and Rule

7    2017, and imposed monetary sanctions beyond the attorney's fee amount.  *See In re Kayne*, 453

8    B.R. at 385; *In re Withrow*, 405 B.R. at 514; *In re Moffett* 2012 WL 693362 at \*4 (Bankr. C.D. Ill.

9    2012); *In re Triepke*, 2012 WL 1229524 at \*4 (Bankr. W.D. Mo. 2012); *In re Alessandro*, 2010

10   WL 3522255 at \*10 (Bankr. S.D.N.Y. 2010).

11                          **c.    The *ABA Standards***

12       Before applying the *ABA Standards* to DeLuca's violations, it is worth recapping what

13   those violations are.  DeLuca violated the duty of competence, Nevada Rule 1.1, by failing to

14   thoroughly investigate her prior petitions to discover the relevant facts therein—a service that was

15   reasonably necessary to achieve Cuomo's reasonably anticipated result—the discharge of all

16   dischargeable debts. DeLuca violated Section 707(b)(4)(C) of the Bankruptcy Code by failing to

17   reasonably investigate the legal and factual circumstances underlying Cuomo's desire to file for

18   bankruptcy—again, by failing to review her prior petitions and ascertain what had changed and

19   why.

20       The *ABA Standards* dictates consideration of four criteria: (1) the duties violated, whether

21   owed to a client, the public, the legal system, or the profession; (2) the lawyer's mental state,

22   whether she acted intentionally, knowingly, or negligently; (3) the seriousness of the actual or

23   potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or

24   mitigating circumstances.  ABA STANDARDS 9; *In re Nguyen*, 447 B.R. at 277.

25                          **(1)    The Duties Violated**

26       The most important duties are those owed to the client—loyalty, diligence, competence,

27

1  and candor.  ABA STANDARDS 9–10.  In descending order of importance are the duties owed to the

2  general public, the legal system, and the legal profession.  *Id.* at 10.  The public is entitled to be

3  able to trust lawyers to protect their property, liberty, and lives.  *Id.*  Accordingly, lawyers should

4  behave with honesty and integrity.  *Id.*  Being able to trust lawyers to protect one's property is

5  especially important for consumer bankruptcy debtors, who typically seek representation in dire

6  circumstances and face a complex legal process.  The system is harmed where lawyers create or

7  use false evidence or intend to deceive the court, and where the lawyer's behavior puts an

8  unreasonable burden on the court.  *Id.*  The profession is harmed where an attorney's practices

9  reflect poorly on the profession or contribute to a decline in the overall quality of services provided

10  by attorneys in a practice area or region.  *See id.*

11       DeLuca violated his duties to the Debtors, the public, the legal system, and the legal

12  profession.  The court considers his violations of the duty of competence to be of the utmost

13  concern.  DeLuca violated one of the essential duties of a lawyer—understanding the client's

14  particular factual and legal circumstance.  He unethically placed the burden on her to determine

15  what facts from her prior petitions were relevant, when he, as the consumer bankruptcy expert, was

16  obligated to thoroughly investigate the relevant facts.  He attempted to contractually divest himself

17  from all obligations to verify the accuracy of her schedules, even if he himself (or his office staff)

18  transcribed the information from the credit reports.  He structured his services like a bankruptcy

19  petition preparer yet charged as an attorney.

20       While it may be challenging to work with a client that does not catch all of her own

21  mistakes, a client must be able to trust that her lawyer will catch those mistakes which are

22  reasonably discoverable.  And this mistake—the omission of a debt that was scheduled in the

23  client's prior petitions—was certainly discoverable with minimal, let alone reasonable, diligence.

24  The challenge of forgetful or inattentive clients is part of the practice of law; the attorney is not just

25  a conduit between client-provided information and the court.  The ethical rules and the Bankruptcy

26  Code impose affirmative duties on lawyers to investigate the client's particular situation and take

1   all reasonable steps to verify the accuracy and completeness of the information on bankruptcy

2   schedules.

3     DeLuca violated his duty to the public by practicing in a manner that erodes the public's

4   trust in attorneys.  He treats all clients the same, creating the impression that attorneys are more

5   interested in fees than solving individual client's problems.  He has the regular practice of not

6   reviewing clients' prior bankruptcy schedules, creating the impression that clients themselves must

7   discern what is and is not relevant for their present situation.  The perceived value of attorneys to

8   take a holistic view of their clients' needs is thus diminished.  As individuals such as Cuomo find

9   themselves entangled in proceedings that could have been avoided with a little extra care by their

10  attorneys at a case's inception, the public's trust erodes.  Because laypeople are not in a position to

11  meaningfully assess their own factual and legal circumstance, the general public is harmed to the

12  extent that DeLuca's practice is becoming the norm for consumer bankruptcy attorneys.  *See id.*

13    For similar reasons, DeLuca's conduct harmed the legal profession.  His practice of

14  deliberately ignoring his clients' prior bankruptcy schedules reflects poorly on the legal profession,

15  as it engenders distrust and the perception that attorneys are inattentive to clients' particular

16  circumstance.  To the extent that DeLuca's practice is becoming the norm for consumer bankruptcy

17  attorneys, it constitutes a decline in the overall quality of services in consumer bankruptcy practice

18  and the Las Vegas region.

19    DeLuca's conduct also harmed the legal system.  If he had performed competently, the

20  court would not be spending limited time and resources to pursue this sanctions matter.  It is

21  possible that the present adversary proceeding would not exist either, as Cuomo would have

22  enjoyed the benefit of the Rule 4007 deadlines, and resources would have thus been saved.

23      **(2)**  **DeLuca's Mental State**

24    The *ABA Standards* defines three mental states — intent, knowledge, and negligence — in

25  descending order of culpability.  ABA STANDARDS 10.  "Intent" is when the lawyer acts "with

26  conscious objective or purpose to accomplish a particular result."  *Id.*  "Knowledge" is when the

1   lawyer acts "with conscious awareness of the nature or attendant circumstances of his or her

2   conduct [but] without the conscious objective or purpose to accomplish a particular result." *Id.*

3   "Negligence" is when a lawyer "fails to be aware of a substantial risk that circumstances exist or

4   that a result will follow, which failure is a deviation from the standard of care that a reasonable

5   lawyer would exercise in the situation." *Id.*

6         DeLuca's conduct here was reckless, or at least undertaken with conscious indifference,

7   which is somewhere in between knowing and intentional as defined in the *ABA Standards*. He

8   admitted that he only reviews prior petitions to determine if a client is eligible to file for

9   bankruptcy. By design, his mode of practice takes a "things change" attitude such that only what is

10  in the client's current credit reports and what the client herself tells him are deemed relevant. He

11  knows or should know that he is turning a blind eye to potentially relevant information in prior

12  schedules. He is consciously indifferent to the probable outcome of inaccurate or incomplete

13  information in a client's present schedule if the information differed in prior schedules.

14                   **(3)    Seriousness of the Injury**

15         "The extent of the injury is defined by the type of duty violated and the extent of actual or

16  potential harm." ABA STANDARDS 11.

17         The court first examines the actual injuries to Cuomo. She is now embroiled in an

18  adversary proceeding that very well could have been avoided. More concretely, DeLuca deprived

19  her of the opportunity of the finite deadline for dischargeability complaints under Rule 4007; he

20  exposed her to open-ended liability, at least until Cuomo amended her schedules. She is now

21  representing herself pro se in this adversary proceeding. Although the adversary proceeding may

22  have occurred in any event, DeLuca's actions increased the probability that it would occur. Given

23  her vulnerability as a debtor with insufficient resources to pay for representation in the adversary

24  proceeding, DeLuca placed her in an especially precarious situation. DeLuca deprived her of the

25  maximum opportunity for the fresh start—the primary objective of bankruptcy. Cuomo is now

26  suffering from stress and uncertainty that bankruptcy is intended to avoid.

1    In addition, she spent time and energy preparing for and attending the OSC Hearing, which

2    of course would not have occurred had DeLuca fulfilled his ethical and statutory duties.

3    As for potential injuries, the outcome of the adversary proceeding is uncertain and the

4    Ritchie Debt may be declared nondischargeable.  While this would not be entirely caused by

5    DeLuca, the court again notes that DeLuca's failure to schedule the Ritchie Debt left the door open

6    for this adversary proceeding.

7                    **(4)     Aggravating or Mitigating Factors**

8    The court may consider aggravating and mitigating circumstances in deciding what

9    sanction to impose.  ABA STANDARDS 25.  Aggravating factors justify an increase in the degree of

10   discipline imposed.  *Id.*; *In re Nguyen*, 447 B.R. at 277.  They include (1) dishonest or selfish

11   motive; (2) a pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge wrongful

12   nature of conduct; and (5) substantial experience in the practice of law.  ABA STANDARDS 26–27.

13   To a lesser or greater extent, all of these factors are present for DeLuca.  He recklessly ignores the

14   information in prior schedules, which surely increases the efficiency of his practice; he justified his

15   conduct by stating that it would be very costly to cross reference all of his clients' past schedules.

16   This efficiency, however, comes at the cost of less attention to clients' particular financial and

17   legal circumstances.  Such a regularized practice can only be characterized as selfish and a

18   violation of the fiduciary duty to place clients' needs first.  DeLuca refused to admit his mistakes;

19   he blames Cuomo for not being sufficiently forthcoming.  Finally, as an experienced consumer

20   bankruptcy practitioner, he should understand that information in prior schedules is always

21   relevant to properly understand a clients' circumstance and may have relevance for the relief

22   available to a client and the risks that a client may face by taking or failing to take certain actions.

23   Mitigating factors justify a decrease in the degree of discipline imposed.  *Id.* at 25; *In re*

24   *Nguyen*, 447 B.R. at 277.  They include: (1) absence of a prior disciplinary record; and (2) timely

25   good faith effort to make restitution or to rectify consequences of misconduct.  To the court's

26   knowledge, DeLuca has only been sanctioned on one prior occasion.  However, that sanctions

31

order—issued by this court—is on appeal.[6]  Thus, the court does not treat that sanctions order as a mitigating factor.  DeLuca has not taken any steps to rectify the consequences of his misconduct or make restitution.

As a mitigating factor, the court notes that DeLuca successfully Cuomo's bankruptcy case to discharge, and he also successfully amended her schedules to include the Ritchie Debt (although that amendment did not itself discharge that debt).  The fact that he amended the schedules without charging additional fees is not a mitigating factor, as he was essentially correcting an omission that he should have caught in the first place.

### d.    Fee Disgorgement

The *ABA Standards* recommends sanctions depending on the duty violated and the lawyer's mental state.  They are a good starting point.  For the types of violations that DeLuca has committed, the suggested sanctions are suspension for knowing violations that cause injury or potential injury to a client, the public, or the legal system and disbarment for intentional violations that cause serious injury or potentially serious injury to a client, the public, or the legal system. ABA STANDARDS 24.

Based on the *ABA Standards* and the court's authority under Sections 105(a), 329(b) and 526(c), the court hereby imposes the following sanction on DeLuca:

The court orders the disgorgement of $851.00 of DeLuca's attorney fees.  This represents 56.8% of his flat fee of $1,499.00, which reflects that the Ritchie Debt ($96,000) is 56.8% of her total scheduled debt ($168,958).  (Bankr. Dkt. No. 1 at 51; Bankr. Dkt. No. 37 at 19, 24.)  Under Section 329(b), the court may order the return of fees that "exceed[] the reasonable value" of the services rendered by DeLuca.  11 U.S.C. § 329(b) (2012).  Although DeLuca did not provide Cuomo with what she reasonably expected in the circumstances—the discharge of all of her otherwise dischargeable debts—his services were not without any value.  He successfully pursued

---

[6]*In re Seare,* No. 12-01108-bam, Dkt. No. 75 (notice of appeal).

1  her case to discharge.  While there is statutory and precedential authority to disgorge all of

2  DeLuca's fees, the court declines to go so far.

3  　　　　There is also support in the Code, the Local Rules, and the *ABA Standards* to suspend

4  DeLuca from practice, but that is generally reserved for intentional violations.  Although DeLuca's

5  conduct was reckless, it did not rise to intentional—as defined in the *ABA Standards*—and thus

6  suspension would be too severe a sanction.

7  　　　　Partial fee disgorgement is appropriate in the circumstances to deter DeLuca and other

8  similarly situated attorneys from similar conduct in the future.[7]  The court believes that other

9  attorneys who operate consumer bankruptcy "mills" are best deterred fee disgorgement that is

10 tailored to the particular violation at hand.  Cuomo was able to obtain some of the relief she

11 initially sought, yet is still mired in a proceeding that could have been avoided.  The reasonable

12 value of DeLuca's services is that which corresponds to the discharged debt.

13 　　**B.**　　　**Motion to Withdraw**

14 　　　　　　**1.**　　　**Legal Standard**

15 　　　　Attorney withdrawal from representation is governed by Local Rule IA 10-6 and Nevada

16 Rule 1.16.  Under the Local Rule, "[n]o attorney may withdraw after appearing in a case except by

17 leave of court after notice has been served on the affected client and opposing counsel."  LR IA 10-

18 6(c).  Also, "[e]xcept for good cause shown, no withdrawal . . . shall be approved if delay of

19 discovery, the trial, or any hearing in the case would result.  Where delay could result, the papers

20 seeking leave of Court for the withdrawal . . . must request specific relief from the scheduled trial

21 or hearing."  LR IA 10-6(e).

22 　　　　Nevada Rule 1.16 articulates the situations in which an attorney *must* withdraw (mandatory

23

24 　　　　[7]In *In re Seare*, this court disgorged all of DeLuca's attorney's fees.  *In re Seare*, 12-01108, Dkt.
No. 59 at 87–89.  Here, the court elects to partially disgorge his fees because Cuomo's primary goal—the

25 discharge of all dischargeable debts—was partially realized.  *In re Seare* was distinct because the debtors'
primary goal—the permanent cessation of wage garnishment—could not reasonably be expected to be

26 fulfilled with the bundled services that DeLuca offered to the debtors.  *See id.* at 36.

1   withdrawal) and those in which an attorney *may* withdraw (permissive withdrawal).  NEV. RULE OF

2   PROF'L CONDUCT 1.16 (2011).  The mandatory grounds for withdrawal are inapplicable here.

3   Permissive withdrawal is allowed if "(1) [w]ithdrawal can be accomplished without material

4   adverse effect on the interests of the client; . . . (6) [t]he representation . . . has been rendered

5   unreasonably difficult by the client; or (7) [o]ther good cause for withdrawal exists.  *Id.* R. 1.16(b).

6   "A lawyer must comply with applicable law requiring notice to or permission of a tribunal when

7   terminating representation."  *Id.* R. 1.16(c); *see* LR IA 10-6(c).  "Upon termination of

8   representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's

9   interests[.]" *Id.* R. 1.16(d).  Put another way, "a lawyer must take all reasonable steps to mitigate

10  the consequences [of withdrawal] to the client."  ABA MODEL RULE OF PROF'L CONDUCT 1.16

11  cmt. 9.

12          Even if the attorney and client have a poor working relationship, permissive withdrawal is

13  generally not allowed if litigation is pending or ongoing; there would be prejudice to the client, the

14  opposing party, or creditors; the court's ability to the manage the docket would be impeded; and/or

15  the withdrawal is a dilatory tactic.  *See Irwin v. Mascott*, 196 F. App'x 455, 455 (9th Cir. 2006);

16  *Rophaiel v. Alken Murray Corp.*, 1996 WL 306457 at *1–2 (S.D.N.Y. 1996); *Malarkey v. Texaco,*

17  *Inc.*, 1989 WL 88709 at *1–3 (S.D.N.Y. 1989); *In re Schley*, 2012 WL 1616817 at *2–3 (Bankr.

18  E.D. Va. 2012); *Danvers Savs. Bank v. Cuddy (In re Cuddy)*, 322 B.R. 12, 17 (Bankr. D. Mass.

19  2005); *Goldstein v. Albert (In re Albert)*, 277 B.R. 38, 50–51 (Bankr. S.D.N.Y. 2002).

20          On the other hand, permissive withdrawal is generally granted if the case is inactive with no

21  pending deadlines; reasonable notice is given to interested parties; the client would not be

22  materially prejudiced; the client has not cooperated with counsel; the client does not object to

23  withdrawal; and/or there is no disruption of judicial administration.  *See Brown & Bain, P.A. v.*

24  *O'Quinn*, 518 F.3d 1037, 1039–42 (9th Cir. 2008); *Brandon v. Blech*, 560 F.3d 536, 537–38 (6th

25  Cir. 2009); *Jo Ann Howard & Assocs., P.C. v. Cassity*, 2012 WL 229316 at *1–2 (E.D. Mo. 2012);

26  *Nat'l Career College, Inc. v. Spellings*, 2007 WL 2048776 at *2 (D. Haw. 2007); *Hammond v. T.J.*

34

1  *Litle & Co., Inc.*, 809 F. Supp. 156, 162–63 (D. Mass. 1992).  *Spellings* considered an

2  uncooperative client and stated that "'[u]nless . . . counsel and [client] are embroiled in an

3  irreconcilable conflict that is so great that it resulted in a total lack of communication . . . , there is

4  no abuse of discretion in denying a motion [to withdraw]'"  *Spellings*, 2007 WL 2048776 at *2

5  (quoting *U.S. v. Cole*, 988 F.2d 681, 683 (7th Cir. 1993)). The court granted withdrawal because

6  the clients had ceased all communication with counsel, the trial was several months away, the

7  clients were behind on payment, and the clients would not suffer any material prejudice.  *Id.* at *1,

8  3.

9                    **2.    Application**

10       DeLuca complied with Local Rule IA 10-6 by seeking leave of court to withdraw and

11  serving his motion to withdraw on Cuomo, the trustee in this case, and the U.S. Trustee.

12       DeLuca's only stated grounds for permissive withdrawal is "irreconcilable differences,"

13  which the court understands to be a contention that "representation . . . has been rendered

14  unreasonably difficult by the client."  NEV. RULE OF PROF'L CONDUCT 1.16(b)(6).  Similarly, the

15  court understands DeLuca's argument that withdrawal will not cause any delay to be that

16  withdrawal would have no material adverse effect on Cuomo's interests.  *Id.* R. 1.16(b)(1).

17       DeLuca does not explain what Cuomo has done to render the representation so difficult, but

18  the court nonetheless determines that his withdrawal is permissible as it would have no material

19  adverse effect on Cuomo's interests.  Most importantly, Cuomo did not object to DeLuca's

20  withdrawal.  At the OSC Hearing, she expressed frustration that DeLuca did not achieve the results

21  she desired in her bankruptcy case, which makes her non-opposition all the more understandable.

22  It also lends credence to DeLuca's unsupported assertion of "irreconcilable differences."  In

23  addition, there are no pending motions or hearings in the bankruptcy case; withdrawal will not

24  cause any delay or materially impact the court's ability to manage its docket or this bankruptcy

25  case.  Cuomo's discharge has already been entered and her schedules have been amended to list the

26  Ritchie Debt.  There appears to be little or nothing left for DeLuca to do in this case.  In short,

35

1    Cuomo is not expecting DeLuca to perform a service or awaiting any relief dependent on such

2    service.  She is not materially prejudiced by his withdrawal.

3         As to the adversary proceeding, DeLuca need not seek leave to withdraw because he is not

4    representing Cuomo in that proceeding.  She declined his offer to represent her in the adversary

5    proceeding, and thus chose to represent herself pro se.

6         In sum, the court GRANTS DeLuca's motion to withdraw from representation in the

7    bankruptcy case.

8    **V.    CONCLUSION**

9         As to the sanctions matter, DeLuca's practice of ignoring prior schedules is reckless and

10   consciously disregards the risks a client may face by having incomplete or inaccurate information

11   in a new bankruptcy petition.  He thus failed to fulfill the duty of competence because, by design,

12   he did not thoroughly review all of the potentially relevant facts in prior petitions.  He did not take

13   the necessary steps to fully comprehend Cuomo's financial and legal situation before filing her

14   petition.  He placed the burden on her to provide accurate information such that he served more

15   like a bankruptcy petition preparer.  This practice represents one of the downfalls of operating a

16   consumer bankruptcy "mill" where clients are treated more like commodities than individuals,

17   where one-size-fits-all is the prevailing attitude in a drive for efficiency and profit.

18        The harm that flows from this type of approach was evident in this case.  Cuomo did not

19   maximize Cuomo's possibility of a fresh start.  In that sense, DeLuca failed one of his most

20   essential duties—providing the maximum remedy possible under the Bankruptcy Code.  As a

21   consumer bankruptcy expert, he can and should do better.  The court believes this sanction

22   sufficiently incentivizes DeLuca and other consumer bankruptcy practitioners to review prior

23   bankruptcy petitions as the rules of ethics and the Code demands.

24        This opinion constitutes the court's findings of fact and conclusions of law under Rule

25   7052, made applicable here by Rule 9014(c).

26        The court will issue separate orders to dispose of the sanctions and attorney withdrawal

1    matters.

2    Copies sent to:
     CM/ECF ELECTRONIC NOTICING
3    BNC MAILING MATRIX

4                                                    ###

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26